UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CYNTHIA A. DuBOSE,

              Petitioner,

    v.

DERRAL G. ADAMS,

              Respondent.

No. 2:17-cv-0550 KJM KJN P

FINDINGS & RECOMMENDATIONS

I. <u>Introduction</u>

       Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In 2011, petitioner pled no contest to one count of second degree murder, with an enhancement for gun use, and sentenced to 25 years-to- life in state prison. Petitioner claims that the trial court abused its discretion and violated her Sixth Amendment right to the effective assistance of counsel by denying petitioner's motion for substitute counsel. After careful review of the record, this court concludes that the petition should be denied.

II. <u>Procedural History</u>

       On September 20, 2010, the district attorney filed an information in the Butte County Superior Court charging petitioner with one count of murder, and alleged that petitioner personally used a firearm, served two prior prison terms, and personally used a handgun. (Clerk's

Transcript ("CT") at 20-22.)  Petitioner entered a plea of not guilty.  (CT 23, 25.)

On November 23, 2011, petitioner entered a negotiated plea.  (CT 42.)  The court amended Count I to allege second-degree murder, and struck the firearm and prior prison terms enhancements, and petitioner pled no contest to second degree murder and admitted the handgun enhancement.  (CT 41-49; Reporter's Transcript ("RT") 1-9, 12.)  Petitioner waived her right to appeal the conviction.  (CT 46.)

On December 27, 2011, in response to petitioner's pro se filing, the trial court set a hearing on January 11, 2012, to determine if petitioner sought to withdraw her plea.  (CT 57.)  On January 11, 2012, the matter was set for hearing on February 1, 2012, for motion to withdraw plea or Marsden motion.[1]  (CT 59.)  On February 1, 2012, the court ordered preparation of the transcript of plea and continued the hearing to February 28, 2012.  (CT 61.)

On February 28, 2012, the trial court held a Marsden hearing, and petitioner's motion to substitute counsel was denied.  (CT 63-65; RT 15-58.)  The trial court expressed concern that certain witnesses had come to light after the plea, noting he wanted to give defense counsel adequate time to meet with petitioner, and ordered counsel to "investigate the claim, and then file a motion if necessary."  (RT 58-59.)

On March 20, 2012, petitioner's counsel informed the trial court that there were no grounds to support a motion to withdraw petitioner's plea, and the motion was withdrawn.  (RT 61; CT 69.)

On May 23, 2012, prior to sentencing, the court noted receipt of numerous pro se communications from petitioner, including her motion to withdraw her plea.  (CT 146-47; RT 65.)  The trial court found no basis to grant the motion and denied the motion to withdraw the plea.  (RT 65.)  The trial court heard from Robert Dubose, Jennie Dubose, Megan Barry, and Alexander Dubose, witnesses for the victim, as well as from petitioner.  (CT 146-48; RT 66-81.)

---

[1]  The term "Marsden motion" comes from People v. Marsden, 2 Cal. 3d 118 (Cal. 1970), holding that, as part of a criminal defendant's right to effective assistance of counsel under the Sixth Amendment, a trial judge must permit a defendant requesting substitute counsel the opportunity to present specific examples of inadequate representation before the court may deny a motion to substitute counsel.  Marsden, 2 Cal. 3d at 123-24.

In sentencing petitioner, the trial court found that petitioner "is a master manipulator and that her tears are for herself, not remorse." (RT 82.) Petitioner was sentenced to an indeterminate state prison term of fifteen years-to-life for Count I, plus a consecutive ten-year sentence for the handgun enhancement. (CT 150-51; 153-54; RT 83-84.) Petitioner was granted a certificate of probable cause. (CT 157-58.)

Petitioner appealed the conviction, and the California Court of Appeal for the Third Appellate District affirmed the judgment on September 18, 2015. (ECF No. 15-1; LD 10.) Petitioner filed a petition for review in the California Supreme Court, which was denied on November 24, 2015. (LD 11-12.)

Petitioner filed a petition for writ of habeas corpus in the Butte County Superior Court, which was denied on November 14, 2016. (LD 13-14.)

Petitioner filed the instant petition on February 21, 2017. (ECF No. 1.)

III. Facts[2]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal provided the following factual summary:

FACTUAL AND PROCEDURAL BACKGROUND

The Crime [FN3]

[FN3: Since defendant pled no contest, we take the facts of her crime from the probation report.]

On May 18, 2010, at around 2:33 a.m., a Butte County Sheriff's deputy responded to defendant's 911 call that her husband Montgomery Dubose was "'down and bleeding from the nose and mouth.'" The deputy arrived to find Montgomery lying in the hallway with an eventually fatal gunshot wound to the forehead. Defendant was holding Montgomery's head to the side and crying out for help. She told the deputy that she had left their trailer to buy cigarettes, but when she returned to get money, she found the front door slightly ajar and her husband bleeding on the floor.

Investigators found no evidence of forced entry or a struggle in the residence. During a second interview that day, defendant gave a detailed time line of that night and said there was only one gun in

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Dubose, No. C071436 (September 18, 2015), a copy of which was appended to the answer (ECF No. 15-1) and also lodged by respondent as LD 10.

their residence, a shotgun. When told that her time line was inconsistent with the timing of her 911 call, defendant reiterated that she had not shot Montgomery.

Investigators learned from several sources that defendant found out that Megan Berry, the mother of Montgomery's 14-year-old son, was seven months pregnant. In addition, defendant had threatened to kill Montgomery, Berry, and her unborn child. She had also pointed a firearm at Montgomery's head two weeks before the incident.

Confronted with this and other incriminating information, defendant said she had "'accidentally'" shot Montgomery. According to defendant, a friend of Montgomery had left a handgun at the residence; when Montgomery asked defendant for it, she handed him the weapon, which was wrapped in a towel, but it accidentally fired, even though she did not have her finger on the trigger. Defendant then threw the gun away in a field, returned home, and called 911. She denied knowing about Berry's pregnancy or making any threats related to it.

Thereafter, additional evidence was developed. Two days before defendant called the police, one of Montgomery's friends observed an argument between Montgomery and defendant, during which defendant was in possession of a pistol. Montgomery's friend took the gun from defendant and removed the clip. One week prior to this event, defendant had told the same witness that she tried to shoot Montgomery. She said she shot at him five or six times and he ran out of the house.

In recorded phone conversations with a Butte County jail inmate between December 23, 2009, and May 15, 2010, defendant made several references to a woman being pregnant with Montgomery's child and that Montgomery had been having sex with that woman. In a March 20, 2010, phone conversation between defendant and Montgomery when Montgomery had been in jail, defendant confronted Montgomery about the pregnancy and his responsibility for it. She also told Montgomery that "'we're done . . . I don't deserve that and it's like everybody knows about it. Me and I -- and I'm the stupid looking one.'" In another jail call on April 25, 2010, defendant told an unknown person that she wanted to kill Montgomery and Berry with a sledge hammer. She added that she was "'ready to bash Monte's brains in.'"

## The Plea

The change of plea hearing took place on Wednesday, November 23, 2011, with trial set for the following Monday. Asked by the trial court if she had enough time to discuss the proposed plea with trial counsel, defendant replied, "Just recently, Your Honor." Asked to explain, defendant told the court, "I just received my discovery, part of it the other day. I had no idea what, you know -- I don't feel that I was given enough time to view my discovery and be able to participate in my trial if I went to trial on Monday."

The trial court asked defendant if she had enough time to talk to her

4

attorney. Defendant answered: "He's talked to me, Your Honor. But there's still things I'm shuffling around in my mind regarding the trial, regarding my discovery. [¶] Just -- just now being able to look at -- I've been here for 18 months, and I haven't had my discovery the whole time or been able to go over."

Defendant's counsel, Jesus Rodriguez, asked the court to give him five to ten minutes to confer with his client. The court agreed, and, after conferring with Rodriguez, defendant told the court she had sufficient time to talk to Rodriguez about the plea and was able to tell him all the facts and circumstances of the case known to her. Defendant then entered a no contest plea to second degree murder and personal use of a firearm. (§§ 187, 12022.5, subd. (a)).

## The *Marsden* Hearing

The court received a letter dated December 5, 2011, in which defendant sought to withdraw her plea. She complained she had been misadvised about credits, contending that Rodriguez told her she would be eligible for parole once she had served 85 percent of the minimum term on the life sentence. She said she would not have accepted the plea had she been properly advised. She also complained that she did not receive all of the discovery, and what was provided was given to her on November 21, 2011, so she did not have adequate time to review it before deciding whether to accept the prosecution's plea offer. She said she had not had contact with Rodriguez for six months prior to taking the plea, and in the five months before that, she had had contact with him only twice. She said "[n]umerous letters" were returned unopened and "numerous phone calls went unanswered." She also said she felt coerced into taking the plea because there had been no change of venue and she could not get a fair trial in Butte County. She requested a *Marsden* hearing.

On February 28, 2012, the trial court conducted a *Marsden* hearing based on the December 5, 2011, letter. The court began the hearing by saying it appeared from her letter that her chief complaint with Rodriguez concerned her not getting credits. It agreed with defendant that pursuant to section 2933.2, she was not entitled to either pre- or post-sentence (conduct) credits in light of her murder conviction. The trial court then went on to explain the benefit of the plea agreement; her maximum exposure if she went to trial was 52 years to life, while she could at most receive a 25-year-to-life sentence under the plea agreement.

The court asked defendant her specific complaints regarding Rodriguez's representation. Defendant said her *Marsden* motion was based on "lack of investigation" as well as "questionable investigative tactics like investigator children searching for evidence." According to defendant, Rodriguez had not returned her phone calls since December 2010 and all of the mail she had sent to him was returned to sender. She told the court that Rodriguez could not be reached by jail phone, so she talked to the head of the public defender office, who said he would talk to Rodriguez and get him to give her the rest of her discovery.

5

Defendant said she had "minimal contact with" Rodriguez, which scared her as she prepared for trial. According to defendant, she signed the plea because "I knew we weren't prepared for trial" and that Rodriguez had not contacted "my witnesses on my behalf." She also gave Rodriguez a list of "like twenty people he could contact" on her behalf, but Rodriguez did not contact any of them.

According to defendant, one of the witnesses, Rachael Gale, would prove that defendant did not know the gun was loaded. Defendant said the clip had been removed by Gale. Gale was supposed to talk to Rodriguez and his investigator, but did not want to "until she had her attorney situation straightened out." Gale left the jail, "and nobody had contacted her after that." Another witness, Ilana Meiri, purportedly was with defendant when she made one of the recorded jail phone calls that the prosecution was going to use to prove motive. She said the phone call was about an incident that had previously happened, not about planning a murder. The person to whom the call was made was by then in prison, so Rodriguez had said "on the record" that he would seek to postpone the trial to investigate that call.

Defendant said she had the names of witnesses, who were discovered after the plea, that would show Berry had made the exact same statements about threats on her life purportedly made by another person. Defendant told the trial court she got the names of these people after her plea, in November. Another witness was Shana Hill, who would refute a witness's statement that defendant had threatened to kill Berry and her unborn child. Hill is best friends purportedly with the person who would have testified about the statements and knows "those statements aren't true and they're not about [defendant]." Defendant said this alleged threat did not happen because she did not know that Berry was pregnant until she was approached by a sheriff's investigator. In February 2011, she gave Rodriguez a typed list of witnesses, people who saw her every day and can speak about her state of mind.

Defendant also claimed Rodriguez was supposed to provide her with 362 pages of discovery, but 237 pages were missing. She was given her initial statements to the police and the credentials of investigating officers, but her discovery did not include toxicology, ballistic reports, or anything beneficial to her. According to defendant, she had asked for an attorney throughout her interrogation, but this was not in her discovery. She felt her discovery was "biased" to coerce her into accepting a plea because Rodriguez did not want her to go to trial.

In addition, defendant thought Rodriguez's investigator, Evie Joseph, had too many cases. She could not contact Joseph when she needed to. Joseph contacted her only before court appearances, and did not talk too much to her. Defendant also told the court about what she characterized as "mitigating factors," such as her 911 call "shows my concern for human life," she was "legally blind," and to her knowledge, no expert witnesses were retained.

Defendant told the court she would not have pleaded no contest had

Rodriguez investigated the case sufficiently, and that he also never moved to suppress her statements in spite of having promised to do so. Rodriguez, who told her he had 274 clients, did not have time to work on her case. Also, he had her waive her preliminary hearing without advising her of its importance.

Rodriguez told the trial court he had been appointed to represent defendant at the outset of the case. He had met her "on numerous occasions" at the jail along with his investigator. He discussed the case with defendant and went over discovery with her. Rodriguez did not give defendant copies of all of her discovery. There were "thousands of pages of discovery," portions of which he had to redact for her. Rodriguez gave defendant the "narrative portions of the reports rather than provide her with pages that don't really contain relevant information for her review."

The defense extended an offer to the prosecution to have defendant plea to voluntary manslaughter with a 10-year gun enhancement. Rodriguez told defendant she would have been awarded 15 percent credits for the time she served if the People accepted the offer. He never told defendant she would get credits on a sentence for second degree murder.

Defendant gave Rodriguez a list of witnesses, but the bulk of them were character witnesses who would not provide any information relevant to the defense. He felt that no witness "can speak to anybody's state of mind." One of defendant's witnesses, Rachael Gale, was represented by counsel. Rodriguez called Gale's counsel, who said he would make every effort to arrange a meeting, but the meeting never took place.

Rodriguez told the court that he did not believe Joseph ever used children when investigating the case for the defense. He said that Joseph told him she had spent a great deal of time with another investigator looking for the gun and she never told him anything about children being involved in looking for the gun.

Regarding communications, Rodriguez used a post office box for client mail. He used a voice mail service and knew clients in jail could not leave voice mails. Rodriguez was working with the jail staff to rectify the problem, but it was not fixed. Instead, Rodriguez tried to visit his incarcerated clients on a regular basis. He knew Joseph had seen defendant at jail on more than one occasion, and defendant's claims regarding visits were inaccurate.

While he told defendant about his workload, Rodriguez "would certainly never go into a case of this magnitude unprepared." He did not move to suppress her statements to the police because he concluded the motion would be fruitless after watching the video recordings of the interviews. Rodriguez would have made efforts to put a battered women's defense in place had they gone to trial, but they were able to settle before having to make a decision regarding the defense.[FN4] He did not receive a list of other witnesses from defendant after her plea.

[FN4: When defendant spoke to the probation officer who prepared the presentence report, she continued to claim the shooting was an accident. In a letter to the trial court dated April 30, 2012, that was not file stamped, but was attached to the probation report, defendant called the victim, "the most loving, kind man I've ever met." The probation officer quoted her as saying "I lost my husband Monte, who was my partner, best friend and the person that I plan [sic] on spending the rest of my life with." She went on to say the victim was "a good man who was honest and hard working, a great husband and a good provider." In a letter dated March 21, 2012, addressed to the court, also attached to the probation report but not file stamped, defendant wrote, "My husband had never physically abused me." It does not sound as if Battered Women's Syndrome was a viable defense.]

Replying to Rodriguez's representations to the court, defendant said he had told her she would be eligible for parole after serving 85 percent of her time. She had told Rodriguez she was not guilty and did not want to sign the agreement, but he told her that this was the best deal she was going to get. She did not read the plea agreement, and Rodriguez did not go over the plea agreement with her.

Defendant told the court she would not make up an allegation that Joseph was using children in the investigation. She knew Rodriguez was busy and liked him as a person, but this was her life.

The trial court noted that the returned correspondence to defendant was correctly addressed to Rodriguez's post office box. Rodriguez could not explain why it would be sent back. Another letter was sent to Rodriguez's physical address, where he does not receive mail.

The trial court asked Rodriguez to respond to defendant's claim that he was not prepared for trial. Rodriguez first summarized the strength of the prosecution's case -- defendant's husband was shot, she made the 911 call, she gave inconsistent stories to law enforcement, she disposed of the firearm, and her statements to the police could not be suppressed. He had not yet listened to the taped conversations but had read the summaries. Rodriguez told defendant that a jury would "have a hard time accepting the fact that she lied to law enforcement not only once but more than once and then made an effort to dispose of the weapon." For this and other reasons, Rodriguez felt it would be better for defendant to secure a plea agreement where she could get out of prison "before she was approaching her mid-nineties."

Rodriguez was prepared to go to trial the next week had defendant rejected the plea offer. When the court asked Rodriguez about his strategy, he explained he would have put defendant on the stand and "let her tell the jury her story as to why she had misled law enforcement in her initial statements to them." Defendant would be allowed to tell the jury she was responsible for the killing but it was accidental. However, Rodriguez went on to explain, "I stressed that it would be difficult to convince a jury of that. The bullet wound to Mr. Dubose in this case was *approximately dead center between his eyes*, and I felt it would be difficult to convince a jury that she had somehow accidently shot him even if that was the case due to the

8

location of the wound, due to [ ] the changing of the statements, due to disposal of the firearm." (Italics added.)

Rodriguez and defendant discussed potential plea agreements throughout the case. Defendant was happy to accept a plea to voluntary manslaughter with a gun enhancement, and Rodriguez sent the prosecution a completed plea form with this plea. However, the prosecution rejected that offer by the defense. Rodriguez told defendant the offer of the second degree murder charge with maximum firearm enhancement of 10 years was the best possible offer she was going to get from the prosecution and that disposition would "at least give her an opportunity of an out date some day." The change of plea hearing was not the first time she had been presented with the second degree murder plea.

Rodriguez felt that defendant understood what she was doing when she entered the plea. They went back and forth on whether she would accept the offer. At one point Rodriguez said, "[W]ell, if you're not comfortable with this, then we're not going to do it." Defendant replied, "[O]kay, let's go ahead and do it." Rodriguez then delivered the plea form to the court. Defendant was upset about taking the plea and started crying. During the recess, Rodriguez reiterated that this was the best deal for her, and defendant agreed to go forward.

Defendant replied that Rodriguez never discussed the final plea agreement with her. The second degree murder plea was presented to her by another attorney, who said Rodriguez had given him permission to present the plea to defendant. Defendant reiterated that she signed the plea because she felt Rodriguez was not prepared, and claimed that she accidentally shot her husband.

The trial court then ruled on defendant's *Marsden* motion. The court stated: "The Court has heard the evidence and there obviously is some conflict between the comments of Mr. Rodriguez and [defendant]. And frankly, after hearing the evidence, *I believe Mr. Rodriguez and I disbelieve [defendant]*." [¶] I think that basically what I have here is a person who is demonstrating buyer's remorse. She decided that she doesn't like the deal and doesn't want to go forward with it. I specifically don't believe [defendant] in terms of the discussion regarding credits. [¶] I do find that Mr. Rodriguez has and has continued to represent Ms. Dubose properly. And there's certainly, in the Court's mind, no breakdown of the relationship between the two that would preclude Mr. Rodriguez from continuing to represent [defendant]." (Italics added.) The trial court denied the *Marsden* motion and reconvened in open court.

The trial court then asked Rodriguez to investigate defendant's claim regarding witnesses found by her since the plea. It would entertain a good faith motion to withdraw the plea based on post-plea evidence, but would not consider any events taking place before the plea. On the next scheduled court date, Rodriguez told the court that he had met with defendant regarding the additional witnesses. He and his investigator discussed the witnesses, and he saw no grounds for a "motion for new trial." Thereafter, defendant wrote the trial court a letter in which she stated she pleaded no contest because she lost

confidence in Rodriguez and sought to withdraw her plea. On the date set for sentencing, the trial court indicated it had reviewed factual allegations defendant submitted in connection with her request to withdraw her plea, noted that she was raising the same issues she had raised at the *Marsden* hearing, and expressly found there was no basis for granting a motion to withdraw her plea.

On the date of sentencing, the trial court made the following observation after listening to defendant's comments to the court: "[Defendant] is a master manipulator and she has twisted comments and statements always to her benefit, never to her detriment."

(ECF No. 15-1 at 3-10).

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining

what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (*per curiam*)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was "erroneous.'""). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

11

decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V. Petitioner's Claim

A. The Parties' Positions

Petitioner claims that the trial court abused its discretion and violated her Sixth Amendment right to the effective assistance of counsel by denying petitioner's motion for substitute counsel on February 28, 2012. (ECF No. 1 at 5.) Petitioner contends that there was a breakdown in communication resulting in an irreconcilable conflict between petitioner and

defense counsel.  She contends such conflict is shown by defense counsel's failure to:  conduct an adequate investigation before advising petitioner to plead to the lesser offense of second-degree murder and admit the gun use enhancement allegation; provide petitioner with sufficient discovery materials to enable her to make a fully informed decision whether or not to plea or stand trial; provide adequate means of communication with petitioner; or independently investigate the facts.  (ECF No. 1 at 6; 18 at 33.)  Petitioner argues that the lack of full discovery and her inability to communicate with counsel by mail or otherwise "went to the core relationship of trust needed between client and counsel."  (ECF No. 1 at 6.)  Petitioner also complains that defense counsel got her to waive her right to a preliminary hearing, depriving her of an ability to assess the strength of the prosecution's case against her.  (ECF No. 1 at 6; 18 at 33.)  Petitioner argues she was deprived of a diligent advocate.  (ECF No. 18 at 36.)

Respondent counters that the Supreme Court has never held how a court must address a motion to substitute counsel, granting state courts a great deal of leeway in addressing such motions.  (ECF No. 15 at 22.)  Respondent argues that because the state appellate court considered the trial court's credibility determination, defense counsel's competent representation, and defense counsel's lack of personal conflict, "it cannot be said that the state appellate court 'erred so transparently that no fairminded jurist could agree with that court's decision.'"  (ECF No. 15 at 27.)  Finally, respondent contends that the state appellate court made a reasonable determination of the facts in light of the record.  (Id.)

B.  State Court Decision

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Defendant contends the trial court abused its discretion in denying her *Marsden* motion to substitute counsel for the purpose of investigating a motion to withdraw her plea because there was an irreconcilable conflict and her motion would have been grounded on ineffective assistance of counsel.  We disagree.
>
> When a defendant seeks to discharge her court-appointed counsel on the basis of inadequate representation, the court must allow the defendant to explain the basis of her claim and to relate specific

instances of counsel's inadequate representation. (*People v. Smith* (2003) 30 Cal. 4th 581, 604.) However, a defendant has no greater right to substitute counsel post-conviction than at earlier stages. (*People v. Smith* (1993) 6 Cal. 4th 684, 694 (*M. Smith*).) If a defendant requests substitute counsel post-conviction and makes a showing during a *Marsden* hearing that counsel is not providing effective representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, substitute counsel must be appointed as attorney for all purposes. (*People v. Sanchez* (2011) 53 Cal. 4th 80, 84, 89 (*Sanchez*); *M. Smith*, at p. 696.) "A trial court should grant a defendant's *Marsden* motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation.'" (*People v. Streeter* (2012) 54 Cal. 4th 205, 230.) A defendant who does not make this showing is not entitled to substitute counsel. (*M. Smith*, at p. 696.)

The decision to discharge appointed counsel and substitute another attorney is within the discretion of the trial court. (*Sanchez, supra*, 53 Cal. 4th at p. 87; *M. Smith, supra*, 6 Cal. 4th at p. 696.) Thus, we review the trial court's decision denying defendant's *Marsden* motion under the deferential abuse of discretion standard. (*People v. Jones* (2003) 29 Cal. 4th 1229, 1245.) "'Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citation.]'" (*M. Smith*, at pp. 690-691.)

Defendant bases her claim on her "verified complaints about her inability to communicate with her counsel, counsel's inadequate investigation, and his refusal to provide her with a major portion of the discovery materials." According to defendant, when the trial court asked Rodriguez to look into her claims regarding witnesses found after the plea, "the court essentially asked the fox to guard the chicken house." She also claims that Rodriguez "wholly lacked the ability to challenge his own ineffectiveness in advising appellant to plead to second degree murder."

Defendant's contentions face two insurmountable obstacles, her lack of credibility and the strength of the case against her. Much of defendant's *Marsden* claim was based on assertions made by her that were contradicted by Rodriguez at the *Marsden* hearing -- Rodriguez did not communicate with her, the defense investigator acted improperly, Rodriguez did not consider the witnesses she identified, Rodriguez was not prepared to go to trial, she found exculpatory witnesses after the plea hearing, and he did not adequately discuss the plea agreement with her. By believing Rodriguez and not believing defendant regarding their conflicting stories, the trial court effectively rejected these claims based on defendant's lack of credibility. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.'" (*M. Smith, supra*, 6 Cal. 4th at p. 696.) In making its credibility determination, the trial court had the benefit of seeing the demeanor and presentation of both defendant and Rodriguez. We must defer to the trial court's credibility

15

determinations, and thus we decline to overturn these findings on appeal. (See *People v. Barnes* (1986) 42 Cal. 3d 284, 306 [Conflicts in testimony do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.].)

Charged with murder, an enhancement for personal use of a weapon causing death or great bodily injury, and two prior prison terms, defendant faced a potential sentence of 52 years-to-life.[FN5] Based on the record before us, the case against defendant was formidable. Defendant gave inconsistent stories to the police about what happened to her husband. She hid the firearm which killed her husband before she called 911, while he was left with a bullet wound to the head in their trailer. It was not until after she hid the gun that she called 911. Her claim of accidental discharge is inconsistent with the nature of her husband's fatal wound, which Rodriguez said was "approximately dead center between [the victim's] eyes."[FN6] Also, she often expressed intent to kill her husband and the woman he impregnated would have been proven by witnesses and her own voice recorded conversations.

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal. 4th 415, 436-437.) Under the plea agreement Rodriguez was able to negotiate, defendant could have received as little as 18 years to life.[FN7] Defendant was 42 years old at sentencing. Even with a sentence of 25 years-to-life, the plea agreement gives her some chance of spending part of her life outside prison, while a jury trial carried a strong risk of a first degree murder conviction and a sentence that would not provide a practical opportunity for parole.[FN8] It was a reasonable tactical decision for Rodriguez to advise defendant to take the plea offer which she ultimately accepted.

Rodriguez prepared for trial; he had an investigator working on the case, which included trying to find the missing gun,[FN9] met regularly with defendant, reviewed her police interrogation, was familiar with the discovered materials, had a good understanding of the relative strength of the prosecution's case, and had prepared a trial strategy. He evaluated the relevance of witnesses defendant suggested might testify in her defense and gave a legal reason why those witnesses would not be helpful. He attempted to arrange a meeting with a represented witness, who purportedly knew that the clip had been removed from the weapon, but was unsuccessful. In light of counsel's competent representation and the lack of any personal conflict with defendant, it was not an abuse of discretion to deny the *Marsden* motion.

[FN 5: The maximum exposure is calculated as follows: Twenty-five years to life for first degree murder, a consecutive 25 years-to-life for the death or great bodily injury firearm enhancement, and two consecutive one-year terms for the prior prison term allegations. (§§

190, subd. (a), 12022.53, subd. (d), 667.5, subd. (b).)]

[FN 6:  At sentencing, the prosecutor also said the victim was shot between the eyes.]

[FN 7:  This minimum exposure under the agreement is calculated as follows: Fifteen years to life for second degree murder plus a three-year lower term for the gun enhancement. (§§ 190, subd. (a), 12022.5, subd. (a).)]

[FN 8:  The firearm enhancement with which defendant was charged carried with it a consecutive 25 years-to-life sentence (§ 12022.53, subd. (d)), so even if she was found guilty by a jury of only second degree murder, the sentence would have been 40 years-to-life. At defendant's age, a life sentence with a 40-year minimum term would seem to be a near de facto life without the possibility of parole sentence.]

[FN 9:  Because defendant disposed of the gun and it could not be found, there was no way to prove a light trigger pressure or malfunction resulted in an unintended discharge of the weapon.]

People v. Dubose, No. C071436, **6-8 (Cal. Ct. App. Sept. 18, 2015).

C.  No Cognizable Claim Based on State Law

        To the extent that the California Court of Appeal rejected petitioner's claim solely on state law grounds based on petitioner's claim that the trial court abused its discretion, this court is unable to review a state court decision on issues of state law.  As discussed above, a writ of habeas corpus is not available for alleged errors in the interpretation or application of state law.  Estelle, 502 U.S. at 67-68.  Thus, the opinion of the California Court of Appeal that no violation of state law occurred when the trial court denied petitioner's motion for substitute counsel to investigate whether to file a motion to withdraw her plea may not be set aside in this proceeding.

D.  Alleged Federal Constitutional Violation

        1.  Legal Standards

        The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The Court of Appeals for the Ninth Circuit has held that denial of a motion pursuant to Marsden may implicate the Sixth Amendment right to counsel.  Schell v. Witek, 218 F.3d 1017, 1023 (9th

17

Cir. 2000) (*en banc*); Hudson v. Rushen, 686 F.2d 826, 828-29 (9th Cir. 1982). But the Sixth

Amendment is not implicated by every conflict between a defendant and counsel. See Daniels v.

Woodford, 428 F.3d 1181, 1196-97 (9th Cir. 2005), cert. denied, 550 U.S. 968 (2007) (The nature

and extent of the conflict must be such as to "depriv[e] the defendant of representation guaranteed

by the Sixth Amendment.").[4] The Supreme Court has recognized that a defendant is entitled to

counsel who "function[s] in the active role of an advocate." Entsminger v. Iowa, 386 U.S. 748,

751 (1967). A defendant is entitled to competent counsel. United States v. Cronic, 466 U.S. 648,

655 (1984).

The Sixth Amendment right to counsel also includes a qualified right to retain counsel of

choice. See Schell, 218 F.3d at 1025 (citations omitted). However, an indigent defendant, while

entitled to appointed counsel, is not constitutionally entitled to appointed counsel of choice.

Hendricks v. Zenon, 993 F.2d 664, 671 (9th Cir. 1993). When a criminal defendant requests a

substitution of appointed counsel, the trial court is constitutionally required to inquire about the

defendant's reasons for wanting a new attorney. Schell, 218 F.3d at 1025 ("[I]t is well

established and clear that the Sixth Amendment requires on the record an appropriate inquiry into

the grounds for such a motion, and that the matter be resolved on the merits before the case goes

forward."). However, the Supreme Court has "reject[ed] the claim that the Sixth Amendment

guarantees a 'meaningful relationship' between an accused and his counsel." Morris v. Slappy,

461 U.S. 1, 13-14 (1983). The Ninth Circuit has found that a trial court's refusal to allow

substitution of counsel can violate a defendant's Sixth Amendment right to counsel if the

defendant and his attorney have an "irreconcilable conflict." Stenson v. Lambert, 504 F.3d 873,

886 (9th Cir. 2007), cert. denied, 523 U.S. 1008 (2008). This level of conflict exists only if

communication has so broken down that it prevents the effective assistance of counsel. Id. at

886; Schell, 218 F.3d at 1026. To determine whether such conflict is "irreconcilable," a court

evaluates three factors: "(1) the extent of the conflict; (2) the adequacy of the inquiry by the trial

---

[4] Daniels is a pre-AEDPA case where the appellate court reviewed the state court conclusions *de novo*. Daniels, 428 F.3d at 1196 & n.24. In the instant case, this court is required to give deference to the state court findings and conclusions under 28 U.S.C. § 2254(d)(1) and (2).

court; and (3) the timeliness of the motion for substitution of counsel." See Stenson, 504 F.3d at 886; Daniels, 428 F.3d at 1197-98.

2. Analysis

As set forth above, respondent lodged a copy of the transcript from petitioner's Marsden hearing. (LD 5.) The undersigned has reviewed the transcript and finds that the California Court of Appeal accurately summarized the transcript.

Turning to the merits of the petitioner's Sixth Amendment claim, timeliness is not an issue. Therefore, the undersigned evaluates only the first two elements, but addresses them in reverse order.

Trial Court's Inquiry

As discussed by the state appellate court, the record reflects that the trial court made full and appropriate inquiries into petitioner's complaints against defense counsel. Petitioner was given an opportunity to address her concerns with counsel. (RT 20-34; 42-47; 53-56.) There is no indication that petitioner was in any way prevented from sharing her concerns with the court. See United States v. Prime, 431 F.3d 1147, 1155 (9th Cir. 2005) (finding inquiry adequate where defendant "was given the opportunity to express whatever concerns he had, and the court inquired as to [defense counsel's] commitment to the case and his perspective on the degree of communication").

Petitioner's defense counsel confirmed that petitioner had provided a list of witnesses, and counsel reviewed the list with his investigator, but the bulk of those witnesses were character witnesses with no testimony relevant to petitioner's defense. (RT 37.) One witness, Rachael Gale, was represented by counsel, but petitioner's defense counsel's efforts to meet with Gale and her attorney failed. (RT 38.) Petitioner's defense counsel could not explain why petitioner's mail addressed to counsel's proper address was returned by the post office, but explained that he had met with petitioner on numerous occasions at the jail with his investigator. (RT 35-36.) Defense counsel stated he discussed petitioner's case with her and went over discovery with her. Counsel did not believe it was necessary to provide petitioner with the "perhaps thousands of pages of discovery" because he had to redact those portions he did provide to petitioner and many of the

pages did not contain relevant information.  (RT 36.)  Defense counsel testified that the only

conversation concerning credits was in the context of a potential voluntary manslaughter plea

offer, which did not materialize.  (RT 36-37.)

With respect to petitioner's claim that defense counsel was not prepared to go to trial,

defense counsel stated that he had explained to petitioner the difficulties of taking her case to

trial, including that she had disposed of the murder weapon, and she had made multiple

inconsistent statements to law enforcement.  Following counsel's review of petitioner's

videotaped statements, he determined there was no basis to argue such statements were

involuntary or coerced.  (RT 49.)  Had the case gone to trial, counsel was prepared to put

petitioner on the stand to explain how she was responsible for the crime, but that it was an

accident.  (RT 50.)  Counsel had further explained to petitioner that it would be difficult for such

testimony to convince a jury because the bullet wound was about dead center between the

victim's eyes.  Defense counsel felt that the location of the wound, petitioner's inconsistent

statements, and her disposal of the gun would make it difficult for a jury to believe that the

shooting was an accident.  (RT 50.)

After reviewing the transcript from the Marsden hearing, the undersigned finds that the

factual record was sufficiently developed to allow the trial court to make an informed decision

that petitioner's claim of conflict with her attorney was not sufficient to require substitute

counsel.  The trial court thoroughly discussed with petitioner, and trial counsel, the grounds of her

motion for substitute counsel.  (RT 20-56.)

The Extent of the Conflict

To the extent that petitioner is arguing her complaints about counsel's performance

created an actual conflict of interest between herself and her attorney, her claim also fails.  See

Schell, 218 F.3d at 1025.  An irreconcilable conflict in violation of the Sixth Amendment occurs

only where there is a complete breakdown in communication between the attorney and client, and

the breakdown prevents effective assistance of counsel.  Schell, 218 F.3d at 1026.  Disagreements

over strategical or tactical decisions do not rise to level of a complete breakdown in

communication.  Id.

The record before this court fails to reflect such a complete breakdown in the relationship. Rather, the substance of plaintiff's complaints appear to be based on her disagreement over defense strategy and her concern that she should seek to withdraw her plea despite defense counsel's position that there were no grounds to support such a motion. It is well-established that tactical matters are within the purview of trial counsel's discretion and disagreements over them do not necessitate substitution of counsel. United States v. McKenna, 327 F.3d 830, 844 (9th Cir. 2003) (holding that dispute over trial tactics "is not a sufficient conflict to warrant substitution of counsel"). In addition, defense counsel's description of his investigation rebutted petitioner's claim that he had not adequately investigated her case or failed to communicate with petitioner. The record reflects that the trial court reasonably rejected the factual premise for petitioner's complaints against trial counsel based on her lack of credibility and the strength of the case against her.

Accordingly, the undersigned finds that the trial court conducted an adequate inquiry that failed to reveal a personal conflict resulting in the violation of petitioner's right to counsel.

In her traverse, petitioner contends she was deprived of a diligent advocate in violation of Cronic, 466 U.S. at 648, Strickland v. Washington, 466 U.S. 668 (1984), and Gideon v. Wainwright, 372 U.S. 335 (1963). (ECF No. 18 at 36.) Petitioner argues that defense counsel claimed he was going to pursue a battered woman's defense but had not yet consulted an expert mere days before trial was set to begin. (Id., citing RT 40.) At the Marsden hearing, defense counsel explained that although they had discussed a battered woman's defense in preparing for trial, and had the case proceeded to trial, they "certainly would have made efforts to get that in place," but counsel's efforts were focused on resolving the case short of trial. (RT 40.) On this record, "[i]t was a reasonable tactical decision for [defense counsel] to advise [petitioner] to take the plea offer which she ultimately accepted." (ECF No. 15-1 at 12.) Moreover, as the state court noted, in light of petitioner's letters to the trial court and her statements to probation concerning her husband, the victim, it is unlikely that such a defense was viable in any event. (ECF No. 15-1 at 7 n.4.)

Finally, petitioner also fails to demonstrate she suffered any actual prejudice because of

the alleged violation of her Sixth Amendment right to counsel.  No independent claim for ineffective assistance of counsel has been presented.  Nevertheless, in light of the strong evidence against her, petitioner cannot demonstrate <u>Strickland</u> prejudice.  Under the plea agreement negotiated by defense counsel, petitioner could have received a sentence of 18 years-to-life, but had she gone to trial, she was faced with a maximum exposure of 52 years-to-life.  As discussed by the state appellate court, under her current sentence, petitioner has some chance of parole, whereas a jury trial exposed her to a potential sentence without such an opportunity given her age of 42.

### 3. <u>Conclusion</u>

For the reasons discussed above, the state court finding that petitioner had an opportunity to express her concerns regarding defense counsel to the trial court and did not have a personal conflict with defense counsel is supported by the record and is not an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  The state court's determination of petitioner's claim is neither contrary to, nor an unreasonable application of, clearly established federal law.  <u>See, e.g.</u>, <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066-67 (9th Cir. 2008) (no Sixth Amendment violation where petitioner's motion for substitute counsel failed to establish any conflict, but rather, petitioner "complained solely about his counsel's strategic decisions and lack of communication with him"); <u>LaGrand v. Stewart</u>, 133 F.3d 1253, 1276-77 (9th Cir. 1998) (rejecting claim of denial of substitute counsel based upon "inadequate time in meetings and of gloomy predictions by trial counsel," noting that the record revealed no "total failure of communication.").  Petitioner is not entitled to habeas corpus relief.

### VI.  <u>Request for Evidentiary Hearing</u>

An evidentiary hearing is not warranted where, as here, "the record refutes the applicant's factual allegations or otherwise precludes habeas relief."  <u>Schriro</u>, 550 U.S. at 474; <u>see also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 183 (2011) (citing <u>Schriro</u> with approval); <u>Estrada v. Scribner</u>, 512 F.3d 1227, 1235 (9th Cir. 2008); <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998).  Therefore, petitioner's request for an evidentiary hearing is denied.

////

VII. Recommendation

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 20, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/dubo0550.157

23